Charles Proffer SAYLOR and Everette G. Rodebaugh

v.

FAYETTE R. PLUMB, INC.

Civ. A. No. 27932.

United States District Court
E. D. Pennsylvania.
March 22, 1962.

Sidney L. Wickenhaver, Montgomery, McCracken, Walker & Rhoads, John W. Logan, Jr., Howson & Howson, Philadelphia, Pa., for plaintiffs.

George V. Strong, Jr., Philadelphia, Pa., for defendant.

JOSEPH S. LORD, III, District Judge.

Plaintiffs are the owners of two patents involving improved means of attaching the heads to the handles of percussive tools, such as hammers, axes, and the like. Defendant corporation (Plumb) is a manufacturer of hand tools, and is also the owner of a patent involving an improved means of connecting tool handles to heads. Defendant has been selling its tools under the trade name "Permabond".

In Count I of the complaint, defendant is alleged to have infringed upon plaintiffs' patents. Count II seeks relief for the alleged misappropriation by defendant of trade secrets disclosed by plaintiffs to defendant. Jurisdiction of this court arises under 28 U.S.C.A. § 1338(a) and (b). Defendant has moved for summary judgment on Count II of the complaint.

Extensive discovery depositions have been taken by defendant, and much of the underlying factual background is without dispute. Plaintiff Saylor (at least for purposes of this motion) is the inventor of Patent No. 2,656,225, applied for on November 16, 1949, and issued on October 20, 1953. The patent involves a means of attaching heads to handles of percussive tools. Prior to this invention, hammers had customarily been constructed by forcibly driving a wooden handle into the eye or opening of the metal head, after which a wedge or screw was driven into the upper end of the handle within the eye in order to hold the parts tightly together. A major problem with this arrangement was the loosening of the head after repeated use, due largely to the crushing by the metal head of the wood fibers of the handle upon the shock of impact.

The object of plaintiffs' invention was to secure the head to the handle in a more permanent manner by cushioning the shock between the handle and head and thus reducing the resultant deterioration of the handle. This was to be accomplished by leaving a space in the eye of the head between the head and the handle, and completely filling this space with rubber or a rubber-like chemical, which through chemical or physical changes wound bond the head to the handle. The cushioning material absorbed the shock, prevented the head from crushing the wood fibers and loosening the handle, and held the head and handle together.

Plaintiffs undertook to interest defendant in the invention,[1] and in April, 1950, in a visit to defendant's plant, they showed defendant's officials a sample which Saylor had prepared. A copy of the patent application was left with defendant. Defendant furnished plaintiffs with handles and heads which plaintiffs assembled and submitted to defendant for testing. Defendant communicated the results of the tests to plaintiffs by letter dated April 25, 1951, and quoted in part infra. It was found that although the bonding held up well, the hammer heads broke, apparently for the reason that the cushioning material prevented the transmission of shock from the head to the handle thereby setting up destructive vibration in the head.

Thereafter, defendant sent plaintiffs additional handles and heads for assembly. These were resubmitted for testing in March, 1952, with various different modifications to overcome the defect. One means of accomplishing this was to use a thinner, stiffer bonding material, which would provide less cushioning but would allow additional communication of the vibrations. Another method was the use of a partial direct contact between

---

1. Plaintiff Rodebaugh had previously contacted Firestone Tire and Rubber Co. to interest that company in the invention. The exhibits make it clear that Firestone considered any inventions on a non-confidential basis. Defendant does not, however, contend here that this was a public disclosure barring any subsequent right of secrecy in dealing with the invention.

the head and the handle to communicate the vibration.

By letter dated May 26, 1952, defendant advised plaintiffs that it was not interested in Saylor's method of rubber bonding. The Saylor Patent No. 2,656,-225 issued on October 20, 1953. On December 14, 1953, plaintiffs applied for a patent claiming invention of a tool and handle connection as in the earlier patent with the additional feature of partial direct contact between head and handle to dampen vibrations. This patent, No. 2,917,349, was issued on December 15, 1959.

Defendant first manufactured and sold its accused hammers in April, 1954. Defendant claims (and plaintiffs of course dispute) that its tool is the outgrowth of a contract which it entered into in October, 1951, with Molded Insulation Co. for development of a plastic hammer handle. Defendant claims that while working on this contract, an employe of Molded Insulation on May 12, 1952, suggested the use of an epoxy resin adhesive as a means of securing the plastic handles to the heads. Defendant investigated the use of this adhesive with conventional wooden handles and found it successful.

On September 13, 1954, a patent application of which defendant was the assignee was filed, claiming a percussive tool, the head and handle of which were bonded together with an epoxy resin but which were at one end in direct contact in order to dampen vibrations set up in the head by impact shock. This patent was issued on September 2, 1958, as No. 2,850,331.

█ Plaintiffs claim that defendant, in the manufacture of its tools beginning in 1954, and in the securing of its Patent No. 2,850,331 made use of trade secrets disclosed to defendant in violation of plaintiffs' rights, and ask that defendant be enjoined from and be made to account for benefits derived from its use of the secrets. Plaintiffs further seek damages and a declaration that defendant is a trustee *ex maleficio* of its Patent No. 2,850,331. The general principles of law on which plaintiffs' claim is bottomed are well established, and for our purpose the statement of the rule in the Restatement of Torts, § 757 will suffice:

> "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if * * *
>
> "(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, * * * *".

The specific disclosures which form the basis of Count II of the complaint are: (a) a tool as set forth in application for Patent No. 2,656,225 having a head and handle bonded together with a shock absorbent rubber-like material; (b) the other contents of that application; (c) use of any rubber-like material, including synthetics, as a bonding; (d) use of partial direct contact; (e) use of a stiffer shock absorbent material; (f) use of the bonding material to cover the end of the handle to seal out moisture; (g) use of red or other attractive colored bonding material; (h) possible methods of assembly; (i) use of the term "permanent bond"; (j) combinations of the various disclosures. Defenses have been asserted to each of the alleged disclosures which, defendant claims, makes summary judgment appropriate as to Count II.

█ On a motion for summary judgment we of course follow the guideposts of Frederick Hart & Co., Inc. v. Recordgraph Corporation, 169 F.2d 580 (C.A. 3, 1948):

> " * * * It is well-settled that on motions to dismiss and for summary judgment, affidavits filed in their support may be considered for the purpose of *ascertaining whether an issue of fact is presented, but they cannot be used as a basis for deciding the fact issue.* An affidavit cannot be treated, for purposes of the motion to dismiss, as proof contradictory to well-pleaded facts in

the complaint. * * * " [2] (Emphasis the Court's.)

One of the major items in dispute is the use of partial direct contact as a means of dampening vibrations of the head. After the first sample hammers had fractured, plaintiffs submitted another sample hammer to defendant employing a method of direct contact. Defendant in its accused tool also employed partial direct contact. Defendant, however, contends that the proof it has submitted makes it clear beyond doubt that (1) the disclosure was by defendant to plaintiffs; (2) the use of direct contact was obvious and well-known in the industry; and (3) the means of partial direct contact disclosed by plaintiffs was so dissimilar to that used by defendant that plaintiffs are not entitled to relief.

These are the significant facts related to partial direct contact: When the original sample broke on testing, defendant wrote to plaintiff Rodebaugh under date of April 25, 1951. After stating that the bond held the handle more permanently than handles assembled in the usual manner, the letter included the following paragraph, heavily relied upon by defendant:

"Unfortunately our striking tests developed an entirely unexpected disadvantage. Nail hammers with the bond broke at the tip of the claws or in the eye. We presume this is due to the fact that the shock of the repeated severe blows in this test is not communicated through the bond to the handle thereby setting up vibration in the head. If this is a fact that could impair the life of the tools, we could not use the bond."

However, the letter then continued immediately thereafter as follows: "To ascertain whether this is so, we propose to send you six more * * * " hammers and handles for assembly and comparison test. Saylor thereafter assembled these additional samples, and in one, known here as the "white tag model", did provide for a means of partial contact between the head and handle to communicate vibrations.

There is no question that defendant's tests revealed the *problem*. Plaintiff Saylor admitted on deposition that he was not aware of the problem until advised of it by the above letter, but the "disadvantage" was also "entirely unexpected" by defendant. Defendant, however, goes on to argue that the letter suggests that plaintiffs find a solution for the problem, and the obvious solution was by bringing the head and handle into direct contact, the means which had always been employed to connect heads to handles. The letter as we read it, does not suggest the obvious solution, or at least does not suggest the solution in such an obvious way that the fact finder could not find otherwise. The solution may be obvious now, but nothing in the hundreds of exhibits or some 900 pages of depositions indicates that any of defendant's employes recognized the solution at that time.

While direct contact was well-known in the industry, and while conventional tools had always employed direct contact and vibrations were communicated thereby, the purpose of this direct contact as it had been used was to connect the head and handle. The communication of vibrations was in effect an unfortunate by-product which plaintiffs and earlier inventors had sought to eliminate. Defendant, at least on the state of the record before us, has not shown us any general recognition of the idea that communication of vibrations by direct contact was a feature to be sought for in order to retain the integrity of a tool head. Nor has defendant shown us any earlier tools which used a bonding material between the head and the handle, while retaining partial direct contact be-

2. While the Court of Appeals spoke of "affidavits", Rule 56 includes "pleadings, depositions, and admissions on file, together with the affidavits".

tween these parts, although we have as a discovery exhibit an earlier tool using a rubber material between head and handle but without any direct contact.

▆ The combination of bonding material and partial direct contact appears to us to be sufficiently novel to raise a factual issue as to its protectability. As a matter of fact, defendant in its application for Patent No. 2,850,331 treated this feature of contact as one of distinct significance and importance in dampening vibrations which would otherwise occur where the handle was isolated from the head. We cannot say that as a matter of law plaintiffs' idea was so obvious or well-known as to be entitled to no protection if it is found that plaintiffs disclosed this feature to defendant.

Defendant next contends that the precise manner of partial direct contact suggested by Saylor and represented in his "white tag model" has never been used by defendant and in no way resembles defendant's design. Plaintiffs' disclosure is characterized as, at best, the disclosure of a fundamental idea without disclosure of the manner in which it was to be perfected, and as a matter of law is not to be protected. Smoley v. New Jersey Zinc Co., 24 F.Supp. 294 (D.N.J. 1938). The method suggested by Saylor is said to be so "commercially impractical" as to be no disclosure of any means for carrying out the principle.

▆ Plaintiffs assert that the difference in design is merely a slight change in form due to production problems and assert that:

"* * * there is no requirement to prove, in order to impose liability, that the alleged offender use such trade secret in precisely the form in which it was disclosed to him. He may be liable even though he use it with various modifications or improvements, as a result of his own efforts. Differences in detail do not preclude liability when substantially the process used by the alleged violator is derived from the other party's secret, *if it be a secret*, in one or more of the ways defined. * * *" (Emphasis the Court's.) Mycalex Corporation of America v. Pemco Corporation, 64 F.Supp. 420, 425 (D. Md.1946).

There is obviously a difference in design between the methods employed by plaintiffs and defendant in communicating vibrations from the head to the handle, but whether this difference is qualitative rather than quantitative is a determination which is a factual one.

On the whole, we view defendant's position on this motion as essentially a request that we decide the factual issues in this case on the basis of defendant's depositions and exhibits rather than having these issues decided at trial. This, of course, we may not do. Upon finding that factual issues exist, the consideration of the District Court must terminate. Frederick Hart & Co., Inc. v. Recordgraph Corporation, supra.

▆ It is unnecessary to pass upon the other defenses asserted. Even if we were to decide these defenses in defendant's favor, it would not be entitled to summary judgment since none of the other defenses are applicable to the issue of partial direct contact, and therefore as to this issue at least the case must be tried. F.R.Civ.P. 56, 28 U.S.C.A. does not contemplate partial summary judgment as to a portion of a single claim. It would be inappropriate to give our view of the merits of the legal positions taken by both sides as to the other alleged disclosures for no determination of ours would be final and the trial judge would be free to reject our views at a later stage of the proceedings. Coffman v. Federal Laboratories, 171 F.2d 94 (C.A. 3, 1948), cert. denied 336 U.S. 913, 69 S.Ct. 603, 93 L.Ed. 1076 (1949).

Having determined that there exists a genuine issue as to a material fact in Count II, it follows that defendant's motion for summary judgment must be denied.